**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| DEANNA HERR, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.: 2:20-cv-10938 |
| ALLEGIANT AIR, LLC, a Nevada Limited Liability Company, | ) ) ) | Honorable |
| Defendant. | ) ) ) | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.     Plaintiff Deanna Herr ("Plaintiff"), by and through her counsel, files this Class Action Complaint against Allegiant Air, LLC ("Defendant" or "Allegiant" on behalf of herself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to her own actions, and upon investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

2.     In the midst of the greatest public health and economic crisis in living memory, Defendant, the ninth largest air carrier in America, has sought to shift its losses onto its innocent passengers, furthering the financial hardship endured by people across the country.

3.     Each of Defendant's airfare tickets encompasses a contractual agreement between it and its passengers. That agreement gives passengers the right to a refund if their flight is cancelled.

4.     With mounting cancellations due to the COVID-19 pandemic, Defendant has sought to refrain from paying out the refunds for cancelled flights to which its passengers are entitled.

5.     Plaintiff brings this action on behalf of herself and a class of similarly situated individuals who were deprived of refunds for cancelled flights.

6.     Defendant has quietly sought to force its passengers to endure the financial losses that its own contract created for it in the entirely foreseeable scenario that world occurrences would disrupt

1

the domestic travel industry.

7.     Defendant's uniform conduct is equally applicable to the class.  Plaintiff brings this class action against Defendant for breach of contract and seeks an order requiring Defendant to, among other things: (1) prohibit Defendant from issuing coupons in lieu of refunds to any Class member who has not requested coupons; and (2) pay damages and/or restitution to Plaintiff and Class members.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendant.  The number of members of the proposed class is in the aggregate greater than 100 and more than two-thirds of the class members reside in states other than the states in which Defendant is a citizen.

9.     This Court has personal jurisdiction over Defendant because it conducts significant, substantial, and not-isolated business activities in Michigan and a substantial portion of the acts complained of took place in Michigan.

10.     Venue is proper in the Eastern District of Michigan because Defendant conducts business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

11.     Plaintiff Deanna Herr is an individual and a citizen of Michigan.

12.     Defendant Allegiant Air, LLC is a limited liability company organized under the laws of Nevada with its principal place of business located in Nevada.

## FACTUAL ALLEGATIONS

13.     Allegiant is a low-cost airline which caters primarily to "leisure travelers" and nearly all major aspects of its business are "intended to appeal to leisure travelers and make it attractive for them

to purchase air travel and related services and products from us." [1]

14.     Defendant only sells airfare directly to customers, not through intermediaries like online travel agencies (Priceline, Expedia, etc.).[2]

15.     In 2019, Allegiant flew more than 15 million passengers on over 110,000 departures. It also sold over 415,000 hotel nights and 1.9 million rental car days.

16.     Allegiant's "route network" provides service on "463 routes between 97 origination cities and 27 leisure destinations, and serving 43 states and Puerto Rico as of February 14, 2020."

17.     Allegiant services destinations in Michigan including Gerald R. Ford International Airport in Grand Rapids, Traverse City Cherry Capital Airport, and Flint Bishop International Airport.

18.     Notably, Defendant owns and manages its own reservation system, which it boasts "gives us the ability to modify our system to enhance product offerings based on our specific needs[.]"

19.     Defendant has acknowledged, in public filings, that its "website and reservation system must be able to accommodate a high volume of traffic and deliver necessary functionality to support our operations."[3]

20.     Each of the tickets sold to fly with Allegiant incorporates by reference and is subject to Allegiant's Contract of Carriage (Exhibit A), which Allegiant drafted.

21.     The Contract of Carriage notes that "[p]assenger transportation by Allegiant Air, LLC. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on or in any Ticketless Travel Confirmation, specified on Carrier's Internet site with respect to electronic ticketing, or published in Carrier's schedules. By purchasing or accepting transportation, the passenger agrees to be bound thereby."

---

[1] Allegiant Travel Company (Defendant's Parent Company) 2019 10-K (http://ir.allegiantair.com/static-files/cec9d1d9-2de2-439a-b57e-4c0f74dcc378), p. 4.

[2] *Id.* at 5.

[3] *Id.* at 15.

22.     Section 85 of Defendant's Contract of Carriage governs "Canceled Flights (both voluntarily changed by the carrier and for reasons beyond the carrier's control)" and states that

> [i]if Carrier delays, cancels, or fails to operate any flight according to Carrier's published schedule, provided in the case of delay that the delay is significant, Carrier will, at the request of a passenger confirmed on an affected flight:
>
> > 1. transport the passenger on another of Allegiant's flights on which space is available at no additional charge; or
> >
> > 2. **refund the unused portion of the passenger's fare in accordance with Article 90 below**; or
> >
> > 3. in the case of a schedule change made voluntarily by Carrier, and provided the schedule change is significant, refund the unused portion of the passenger's fare in accordance with Article 90 below.

Contract of Carriage Section 85.A-B (emphasis added).

23.     To make matters worse, Defendant recently updated its Terms & Conditions to indicate that "[e]ffective April 10, 2020, all travel involving credit voucher funds from a given itinerary number must be completed no later than 730 days (two years) from the original booking date under that itinerary. Travel for a credit voucher issued prior to April 10, 2020 is valid for 365 days (one year) from the original booking date under that itinerary."[4]

24.     To the extent that it can be argued that Defendant's terms purport to require any affirmative action on the part of any passenger to choose a monetary refund over an automatic coupon or voucher (by their terms, they do not), such requirement is void as contrary to law and public policy. The United States Department of Transportation ("DOT") is now seeking to force carriers who have attempted to engage in this behavior to contact such passengers and notify them of their right to a refund.

25.     On April 3, 2020, the DOT issued a notice to remind carriers "that passengers should be refunded promptly when their scheduled flights are cancelled or significantly delayed." It notes that

---

[4] https://www.allegiantair.com/terms-and-conditions (last accessed April 15, 2020).

"[a]lthough the COVID-19 public health emergency has had an unprecedented impact on air travel, the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged." [5]

26.    The notice continues that

[t]he Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.

Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier.1 The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions).2 The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger. Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the carriers' obligation that could subject the carrier to an enforcement action.

…

Specifically, the Aviation Enforcement Office will refrain from pursuing an enforcement action against a carrier that provided passengers vouchers for future travel in lieu of refunds for cancelled or significantly delayed flights during the COVID-19 public health emergency so long as: (1) the carrier contacts, in a timely manner, the passengers provided vouchers for flights that the carrier cancelled or significantly delayed to notify those passengers that they have the option of a refund; (2) the carrier updates its refund policies and contract of carriage provisions to make clear that it provides refunds to passengers if the carrier cancels a flight or makes a significant schedule change; and (3) the carrier reviews with its personnel, including reservationists, ticket counter agents, refund personnel, and other customer service professionals, the circumstances under which refunds should be made.

27.    Further, 49 U.S.C. 41712 prohibits unfair or deceptive practices in the air carrier industry and "since at least the time of an Industry Letter of July 15, 1996…the [DOT]'s Aviation

---

[5] https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf (last accessed April 15, 2020).

Enforcement Office has advised carriers that refusing to refund a non-refundable fare when a flight is canceled and the passenger wishes to cancel is a violation" of that section. Enhancing Airline Passenger Protections, 76 Fed. Reg. 23110-01, at 23129.

28.     Defendant has deprived Plaintiff and the Class of the refunds to which they are entitled by 1) failing to provide refunds to their credit or debit cards; 2) automatically issuing coupons or vouchers in place of refunds; 3) rendering it functionally impossible to specifically request refunds over vouchers/coupons by inaccessibility of customer service, with wait times of more than two hours frequently reported; and/or 4) obscuring passengers' right to a monetary refund.

29.     As part of the Coronavirus Air, Relief, and Economic Security ("CARES") Act, the airline industry, including Defendant, received a $25 billion bailout from American taxpayers.

30.     According to public reports, Defendant will receive substantial grants and loans from the federal government, yet it is still using its passengers as a source of interest-free loans which are to be repaid only with potentially worthless, expiring coupons.

31.     Upon information and belief, Defendant has delayed the cancellation of flights it knew it could not operate in the hopes that passengers would cancel before it did, and therefore Defendant would be able to attempt to treat those passengers' tickets differently than those of customers who retained the tickets until cancellation.

### *Plaintiff's Use of Defendant's Services*

32.     On or about February 16, 2020, Plaintiff Herr, while in Michigan (and in this judicial district) purchased two one-way tickets from Allegiant to fly from Flint (Michigan) Bishop International Airport to Orlando (Florida) Sanford International Airport on flight 2372, scheduled to take place at 9:27 a.m. on April 8, 2020.

33.     Plaintiff paid approximately $145 for the two tickets.

34.     The purpose of Plaintiff's travel was to help her parents return by car to Michigan for the year from their seasonal home in Florida.

35.     On or about March 20, 2020, while in Michigan (and in this judicial district) after

becoming concerned about the availability of air travel into April, Plaintiff contacted allegiant to switch her flight to March, 25, flight 2306 departing at 12:21 p.m. She paid an additional $6 for the difference in fares.

36.    On March 23, 2020, Michigan Governor Gretchen Whitmer issued Executive Order No. 2020-21, known as the state's first "Stay-at-home Order," to become effective the following day. The order required all Michigan residents to remain in their homes, with certain limited exceptions.

37.    At close to the same time, Allegiant still had not cancelled Plaintiff's flight, so Plaintiff indicated to Allegiant customer service that it would cancel her ticket and provide her with a voucher or coupon, despite Plaintiff's preference and request for a refund.

38.    Subsequently, Defendant cancelled flight 2306 on which Plaintiff was booked, as well as an enormous volume of Defendant's other scheduled flights.

39.    Instead of the monetary refund to which she was entitled, Plaintiff now holds a voucher from Defendant which Defendant asserts she must use before February 16, 2020, despite the fact that no person knows whether or not it will be safe to engage in air travel by that deadline.

## CLASS ALLEGATIONS

40.    Plaintiff brings this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

> All persons residing in the United States or its territories who purchased tickets for travel on an Allegiant Air flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by Allegiant, and who were not provided a refund. Excluded from the Class are (a) any person who has specifically requested a coupon or voucher in lieu of a refund; (b) any person who requested and received alternative air transportation in lieu of a refund; (c) all persons who are employees, directors, officers, and agents of either Defendant; (d) governmental entities; and (e) the Court, the Court's immediate family, and Court staff.

41.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

42.    Numerosity. Fed. R. Civ. P. 23(a)(1).  Defendant carries over 15 million passengers per year on over 110,000 normally scheduled of flights. A significant percentage of those flights over the past month have been cancelled. At a minimum, there are tens of thousands of Class Members but very

likely many more.  The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendant's records.

43.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  Common issues include:

      A.     Whether Defendant formed contracts with its passengers in selling them tickets for air travel;

      B.     Whether Defendant's conduct breaches the terms of its contracts with its passengers, including its Contract of Carriage and Terms of Service;

      C.     Whether Defendant is required to provide a refund, rather than  an expiring voucher, to passengers for cancelled flights.

      D.     The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled.

44.     Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class she seeks to represent.  Plaintiff and all Class members were exposed to substantially similar contracts, breaches, and sustained injuries arising out of and caused by Defendant's unlawful conduct.

45.     Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiff's counsel is competent and experienced in litigating class actions.

46.     Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.  Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendant's misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

47.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to

individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

48.     Class certification is also appropriate under Rule 23(b)(2), as Defendant has acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Breach of Contract

49.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

50.     A contract was formed between Plaintiff and Class members on the one hand and Defendant on the other with respect to the purchase of airfare.

51.     The contract was offered by Defendant and formed at the time Plaintiff and the Class accepted it by purchasing their tickets.

52.     The contract that governs the transactions at issue in this case requires refunds for cancelled flights where the passenger does not elect to take substitute transportation.

53.     Plaintiff and the Class performed their obligations under the contract.

54.     Defendant breached the contract when they sought to provide coupons or vouchers in lieu of refunds for passengers on canceled flights.

55.     Defendant's breaches were willful and not the result of mistake or inadvertence.

56.     As a result of Defendant's breach Plaintiff and other Class members have been damaged in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)     Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)     Order Defendant to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendant to disgorge profits they realized as a

result of their unlawful conduct;

(c)     Order Defendant to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d)     Declare Defendant's conduct unlawful and enter an order enjoining Defendant from continuing to engage in the conduct alleged herein;

(e)     For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(f)     For costs of the proceedings herein;

(g)     For reasonable attorneys' fees as allowed by law; and

(h)     Award such other relief as the Court deems appropriate under the circumstances.

## <u>JURY DEMAND</u>

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  April 15, 2020                              Respectfully submitted,

**LIDDLE & DUBIN, P.C.**

<u>s/ Nicholas A. Coulson</u>

David R. Dubin
ddubin@ldclassaction.com
Nicholas A. Coulson
ncoulson@ldclassaction.com
975 E. Jefferson Avenue
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025

*Attorneys for Plaintiff and the Putative Class*

Exhibit A

# Allegiant Contract of Carriage



Effective on and after April 16, 2019

Passenger transportation by Allegiant Air, LLC. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on or in any Ticketless Travel Confirmation, specified on Carrier's Internet site with respect to electronic ticketing, or published in Carrier's schedules. By purchasing or accepting transportation, the passenger agrees to be bound thereby.

Review Allegiant's Terms and Conditions on ticketing, non-refundability, baggage and check-in.

Review Allegiant's Luggage Limitations of Liability

Review Allegiant's Notice - Overbooking of Flights

## 1. Definitions

**Baggage** means all luggage, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, typewriters, and similar articles, whether carried by the passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the passenger in the passenger cabin, will not be considered as baggage.

**Baggage tag/Baggage Check** means a document issued by Carrier solely for identification of checked baggage, a portion of which (Tag) is affixed by Carrier to a particular article of checked baggage for routing purposes and a portion of which (Check) is given to the passenger for the purpose of claiming the baggage.

**Carriage** means the transportation of passengers and/or baggage by air, gratuitously or for hire, and all services of Carrier incidental thereto.

**Carrier** means Allegiant Air, LLC.

**Checked baggage** means baggage of which Carrier takes sole custody and for which Carrier has attached a baggage tag(s) and/or issued a baggage check(s).

**Individual with a disability** means a person who:

1. has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities;
2. has a record of such an impairment; or
3. is regarded as having such impairment, as further defined in U.S. Department of Transportation regulations at 14 C.F.R. § 382.3.

**Nonstop flight** means a flight scheduled to operate between the origin and destination points without intermediate stops.

**One–way** means travel from one point to another on Carrier's scheduled air service assigned for travel between the two points.

**Passenger** means any person, except members of the crew, carried or to be carried in an aircraft with the consent of Carrier.

**Qualified individual with a disability** means an individual with a disability who:

1. with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares, or policies, takes those actions necessary to avail himself or herself of facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by Carrier;
2. with respect to obtaining air transportation on Carrier, offers, or makes a good faith attempt to offer, to purchase or otherwise to validly obtain air transportation; or
3. with respect to obtaining air transportation or other services or accommodations, as provided by U.S. Department of Transportation regulations on Nondiscrimination on the Basis of Disability in Air Travel, 14 C.F.R. Part 382:
a. purchases or possesses a valid Ticketless Travel Confirmation for air transportation on Carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the Confirmation has been purchased or obtained;
b. meets reasonable, nondiscriminatory requirements of this Contract of Carriage applicable to all passengers; and
c. whose carriage will not violate the requirements of the Federal Aviation Regulations or jeopardize the safe completion of the flight or the health or safety of other persons.

**Roundtrip** means travel from one point to another and return to the first point.

**Scheduled air service** means any flight scheduled in the current edition of the Official Airline Guide (OAG), Carrier's published schedule, Carrier's Internet site, or the computer reservation system used by Carrier.

**Ticketless Travel Confirmation** means the electronically–recorded information in Carrier's computer reservation system that provides for the carriage of the passenger occupying a single seat and his or her baggage.

**Unchecked baggage** is baggage other than checked baggage.

## 2. Not Used

## 3. Application of Conditions

The terms and conditions contained in this Contract of Carriage shall govern the application of all fares, rates, and charges published by Carrier and will apply only to Carrier's routes and services. No agent, servant, or representative of Carrier has authority to change or waive any provision of this Contract of Carriage unless authorized by a corporate officer of Carrier.

## 4. International Travel

In the event that any passenger purchasing transportation on Carrier may be determined to be in international transportation under the Montreal Convention, Carrier's liability in the event of a passenger's death or bodily injury is limited, in most cases, to proven damages not to exceed 113,100 Special Drawing Rights per passenger, with liability up to this limit not dependent upon negligence on the part of Allegiant.

## 5. Electronic Surveillance of Passengers and Baggage

Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge.

## 6. – 9. Not Used

## 10. Refusal to Transport

Carrier will refuse to transport, or will remove from an aircraft at any point, any passenger in the following circumstances:

A. Safety and Government Request or Regulation – Whenever such action is necessary for reasons of aviation safety or to comply with any Federal Aviation Regulation or other applicable U.S. or foreign government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions beyond Carrier's control (including, without limitation, acts of God, force majeure, strikes, civil commotions, embargos, wars, hostilities, or disturbances, whether actual, threatened, or reported).

B. Search of Passenger or Property – Any passenger who refuses to permit the search of his or her person or property for explosives or a concealed, deadly, or dangerous weapon or article.

C. Proof of Identity – Any passenger who refuses on request to produce positive identification.

NOTE: Carrier shall have the right to require, but shall not be obligated to require, positive identification of persons purchasing ticketless travel and/or presenting a Ticketless Travel Confirmation for the purpose of boarding aircraft.

D. Special Medical Requirements – Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft, incubators, respiratory assistance devices that must receive power from the aircraft's electrical power supply, or persons who must travel on a stretcher. The user must have a sufficient power supply during the flight to power the device, including a conservative estimate of any unanticipated delays. Spare lithium batteries for POCs are prohibited from being carried in checked baggage. Devices may not be charged using on-board power outlets.

E. Qualified Individuals with a Disability – Carrier will transport qualified individuals with a disability in accordance with the conditions and requirements of U.S. Department of Transportation regulations, 14 C.F.R. Part 382, unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.27, Carrier requires 48 hour minimum advance notice and 1 hour advance check–in for a qualified individual with a disability who wishes to receive the following services available on the carrier's flights: (1) Provision by the carrier of hazardous material packaging for a battery for a wheelchair or other assistive device, (2) Accommodations for a group of ten or more qualified individuals with a disability, who make reservations and travel as a group, (3) Provision of an on–board wheelchair on aircraft that does not have an accessible lavatory. However, pursuant to 14 C.F.R. § 382.113, Carrier will not provide certain extensive in–flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, Carrier may require that a qualified individual with a disability be accompanied by an attendant as a condition of being provided air transportation in the following circumstances:

1. When the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from Carrier's Employees, including the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4);

2. When the individual has a mobility impairment so severe that the individual is unable to assist in his or her own evacuation of the aircraft; or

3. When the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with Carrier's Employees adequate to permit transmission of the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4) —and to enable the individual to assist in his or her own evacuation of the aircraft in the event of an emergency.

If Carrier determines that an individual meeting the criteria of Article 10.E. (1), (2), or (3) above must travel with an attendant, contrary to the individual's self–assessment that he or she is capable of traveling independently, Carrier will not charge the individual with the disability for the transportation of the attendant while accompanying such individual. Furthermore, if, because there is not a seat available on a flight for an attendant whom Carrier has determined to be necessary, an individual with a disability having a confirmed reservation is unable to travel on the flight, such individual will be eligible for denied boarding compensation under Article 105 below. For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the individual with the disability.

F. Comfort and Safety – Carrier may refuse to transport or remove from the aircraft at any point any passenger in the following categories as may be necessary for the comfort or safety of such passenger or other passengers:

1. Persons whose conduct are or have been known to be disorderly, abusive, offensive, threatening, intimidating, or violent;

NOTE: Carrier will not refuse to provide transportation to a qualified individual with a disability solely because the individual's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

2. Persons who are barefoot (other than infants);

3. Persons who are unable to occupy a seat with the seat belt fastened;

4. Persons who appear to be intoxicated or under the influence of drugs;

5. Persons who are known to have a contagious disease, if the Carrier determines the person's condition poses a direct threat as defined in 14 CFR § 382.3;

6. Persons who have an offensive odor, except where such condition is the result of a qualified disability;

7. Persons who have clothing/attire/accessories that are deemed patently offensive or obscene by other passengers and choose not to remove, change or cover the article(s).

8. Persons who wear or have on or about their persons concealed or unconcealed deadly or dangerous weapons; provided, however, that Carrier will carry passengers who meet the qualifications and conditions established in Federal Aviation Regulation, 14 C.F.R. § 108.11;

9. Manacled persons in the custody of law enforcement personnel; persons brought into the airport in manacles; persons who have resisted escorts; or escorted persons who express to Carrier's Employees an objection to being transported on the flight;

10. Persons who have misrepresented a condition which becomes evident upon arrival at the airport, and the condition renders the passenger unacceptable for carriage;

11. Infants fourteen (14) days of age or younger, unless approved for carriage in writing by an attending physician; or

12. Persons who are unwilling or unable to abide with Carrier's non–smoking rules.

Disposition of the fare of any passenger denied transportation or removed from Carrier's aircraft enroute under the provisions of Article 10 is governed by Article 90 of this Contract of Carriage.

## 11. – 14. Not Used

## 15. Ticketless Travel Confirmation – General

A. No person shall be entitled to transportation except upon presentation of a valid Ticketless Travel Confirmation or proof of identification acceptable to Carrier that transportation has been purchased through Carrier's electronic ticketing or Ticketless travel systems. Such electronic ticketing documentation shall entitle the person to transportation only between the points of origin and destination.

B. A Ticketless Travel Confirmation is valid for 365 calendar days from the date of issue, except as noted below:

1. Ticketless Travel Confirmations issued with fare restrictions, i.e., nonrefundable fares, are valid only on the flight and date shown on the Ticketless Travel Confirmation. If a Customer purchases transportation with fare restrictions but chooses not to travel on the flight and date for which the Ticketless Travel Confirmation is issued, the fare paid may, within 365 calendar days from the date of purchase, be applied toward the purchase of another Ticketless Travel Confirmation; however, the new Confirmation may be subject to a change fee and be more expensive or subject to different terms, conditions, or restrictions. No cash refund or credit card adjustments will be made for Ticketless Travel Confirmations with fare restrictions.

C. Ticketless Travel Confirmations are not transferable unless specified thereon, but Carrier is not liable to the owner of a Confirmation for honoring or refunding such Confirmation when presented by another person.

## 16. – 19. Not Used

## 20. Reservations

A. A reservation on a given flight is valid when the availability and allocation of space is confirmed by a Reservations Sales Agent of Carrier or upon issuance of a Ticketless Travel Confirmation number, and the passenger's name is entered into Carrier's reservations system.

B. Airport check–in time limits: Carrier may cancel the reservation of any passenger who fails to check–in at least 45 minutes and arrive at the boarding gate at least 30 minutes before the scheduled departure time of the flight for which the reservation was made.

C. Carrier will refuse to carry any person when such refusal is necessary to comply with an applicable governmental regulation.

D. When a roundtrip or multi–segment reservation has been made and the passenger fails to claim his or her reservation for the first portion of the trip, Carrier reserves the right to cancel the return or continuing portions of the passenger's reservation for purposes of reservation inventory management.  Carrier does not prohibit or penalize what is commonly known as "back–to–back" or "hidden–city" ticketing.

## 21. Groups Policies

A. Groups of ten (10) or more will need to be booked on multiple reservations.

## 22. – 24. Not Used

## 25. Ground Transportation

Carrier does not assume responsibility for the ground transportation of any passenger or his or her baggage between any airport used by Carrier and any other location. Ground transportation is at the passenger's risk and expense. An exception to this article is if, for reasons outside Carrier's control, the Carrier is unable to land at the airport of the scheduled destination and is diverted to another airport as described in article 85.G.

## 26. – 29. Not Used

## 30. Application of Fares – General

A. Transportation is subject to the fares and charges in effect on the date on which such Ticketless Travel Confirmation was issued. If a Ticketless Travel Confirmation has been issued before an increase in the fare becomes effective, it shall be honored for transportation between the points, and at the class of service, for which it was purchased. The only exception for a post-purchase price increase would apply if the full amount of the itinerary has not yet been paid. This includes, but is not limited to, an increase in the price of seats, an increase in the price for the carriage of passenger baggage, an increase in an applicable fuel surcharge, or an increase in a government-imposed tax or fee. Fares may fluctuate and are subject to change without notice. No refunds or airline system credits will be provided after a reservation has been made through Customer Care. However, customer can make changes to reservations online at www.allegiantair.com.

B. Fares are published in Carrier's reservations system and may be obtained from an Allegiant Air Reservations Sales Agent by telephone at (702) 505-8888 on Carrier's Internet site at www.allegiantair.com, or through an authorized travel agent. Some travel agencies, however,

may impose an additional charge for this service.

C. All published fares and charges are stated in U.S. currency.

D. No stopovers are permitted on published fares, except upon combination of local fares.

## 31. – 34. Not Used

## 35. Carriage of Children

A. Children Under Two (2) Years of Age – One child under two (2) years of age, not occupying a seat, will be carried without charge when accompanied by a fare–paying passenger fifteen (15) years of age or older. Carrier cannot guarantee that an unoccupied seat will be available for any child traveling without charge and without a confirmed reservation. Proof of age, such as a birth certificate, is required. Safety seats for children without a confirmed reservation may have to be transported as checked baggage if unoccupied seats are not available.

B. Children under two (2) years of age traveling on a confirmed reservation, with or without the use of a safety seat, will be charged the applicable fare.

C. Unaccompanied Minor Children

1. Carrier does not accept reservations for carriage of fare-paying Unaccompanied Minors or unescorted children under the age of fifteen (15) years.

2. Children fourteen (14) years and younger must be accompanied by an adult fifteen (15) years or older.

3. Special supervision for any travelers is not offered.

D. Responsibilities of Carrier – Carrier assumes no responsibilities for travelers fifteen (15) to seventeen (17) years old beyond those applicable to adult passengers.

E. In the case of a flight for which Carrier has issued a weather advisory, Carrier will refuse carriage to any passenger under the age of 18 if not traveling with a passenger age 18 or older.  Carrier will provide passengers refused carriage under this provision transportation on Carrier's next flight to passenger's destination that is not subject to a weather advisory and on which space is available, or a refund of the unused portion of passenger's fare in accordance with Article 90 below.  A "weather advisory" is issued by Carrier and notified to passengers when weather conditions may prevent the flight from landing at the planned destination because airport conditions or visibility fall below FAA or Carrier safety requirements, meaning Carrier may be unable to operate the flight or may have to land at an alternate airport.

## 36. Not Used

## 37. – 41. Not Used

## 42. Internet Fares

Special promotional fares may be available via the Internet on Carrier's website (Internet address: www.allegiantair.com). Seat availability, fares, and fare restrictions are published in the website presentation.

## 43. Stopovers

A. Carrier's local fares for a flight or flights between a passenger's point of origin and destination shall apply only to published nonstop flights, except as provided in Article 85.A. below.

B. A stopover shall occur when a passenger arriving at an intermediate or connection point on his or her itinerary fails to depart from such intermediate point on the published connecting flight to the passenger's next intermediate or destination. In the event of a single stopover, the passenger's fare shall be the sum of the appropriate local fares between the point of origin and stopover and the appropriate local fare between the point of stopover and destination. In the event of multiple stopovers, the passenger's fare shall be the sum of:

1. the appropriate local fare between the point of origin and first stopover; plus
2. the appropriate local fare(s) between each stopover point and the next subsequent stopover point, if any; plus
3. the appropriate local fare(s) between the point of last stopover and destination.

## 44. Not Used

## 45. Acceptance of Baggage – General

A. Inspection – All baggage tendered to Carrier for transportation is subject to inspection by Carrier.

B. Acceptance – Carrier will accept as baggage such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the passenger, as the personal property of the fare–paying passenger and not intended for sale to other persons, subject to the following conditions:

1. Carrier will refuse to accept baggage for transportation on any flight other than the flight on which the passenger is transported;
2. Carrier will refuse to accept any baggage for transportation if it or its contents cannot withstand ordinary handling, or if its weight, size, or character renders it unsuitable for transportation on the particular aircraft on which it is to be carried, unless the passenger releases Carrier from liability;
3. Each piece of baggage tendered to Carrier for carriage must have affixed thereto a current identification tag or label with the passenger' s name, address, and telephone number (if available);
4. With the exception of wheelchairs, other mobility aids, and assistive devices used by an individual with a disability, Carrier will not accept as baggage any item having outside measurements (i.e., the sum of the greatest outside length plus the greatest outside height plus the greatest outside width) that exceed eighty (80) inches, or that weigh more than forty (40) pounds, except as provided in Article 65 below;
5. Carrier will refuse to accept baggage that, because of its nature, contents, or characteristics (such as sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to passengers or Carrier's Employees, damage to aircraft or other equipment, or damage to other baggage; and

6. Carrier will not accept baggage that cannot safely be carried in the baggage compartment of the aircraft.

# 46. Carry–on Baggage

A. Carrier will determine whether or not any baggage of a passenger, because of its weight, size, contents, or character, may be carried in the passenger cabin of the aircraft. Each item of carry–on baggage may have external dimensions no larger than nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.). All carry–on baggage must be stowed underneath a seat or in an overhead compartment. Hard–sided items (i.e., those with inflexible surfaces) may be placed only on the floor of the overhead compartment (i.e., not on top of other items in the compartment) or underneath a seat. Carry–on baggage is the sole responsibility of the passenger. Claims for damaged, lost, forgotten, or stolen carry–on baggage will not be accepted by Carrier. Allegiant Air will charge a fee for a carry-on bag as well as for items intended to carry–on board the aircraft, but which exceed the specified dimensions, and/or require the services of gate checking at the aircraft door.

B. In accordance with FAA/TSA Security Directives, passengers are restricted to one (1) item of carry–on baggage that does not exceed external dimensions of nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.) (e.g., roll–aboard bag, garment bag, tote bag) plus one smaller personal–type item (e.g., purse, briefcase, laptop computer, small backpack), not to exceed external dimensions of seven inches by fifteen inches by sixteen inches (7 in. x15 in. x16 in.), provided that such items are capable of being carried onboard the aircraft by one person without assistance and are capable of being stowed in an overhead compartment or completely underneath a seat. If requested, qualified individuals with a disability will be provided assistance by Carrier's Representatives in loading, stowing, and retrieving carry–on items, including authorized assistive devices. Carrier reserves the right to further restrict the size and number of carry–on items.

C. In addition to the carry-on baggage allowance provided herein, items such as reading material, food for en route consumption, a diaper bag, a small camera, and a coat, jacket, wrap, or similar outer garment, may be carried onboard the aircraft.

D. Mobility and other assistive devices authorized for carriage in the aircraft cabin upon which a qualified individual with a disability may be carried in addition to the two (2) item cabin baggage allowance.

E. Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of transportation at the appropriate fare to ensure that a safety seat or infant seat may be used during flight. Only federally–approved and labeled safety seats or infant seats are permitted for use aboard Carrier's aircraft. Federal regulations prohibit the use of child booster seats and harness–type or vest–type restraining devices, except for the AmSafe Aviation CARES.

F. The following conditions apply to acceptance for carriage in the aircraft passenger cabin of bass violas, cellos, guitars, and other musical instruments, and electronic, computer, and audio/video equipment and parts thereof, whose size prevents such instruments or equipment from being handled as normal carry–on baggage:

1. the instrument or equipment must be contained in a case;

2. a reservation must be made for the instrument or equipment at the applicable fare;

3. the instrument or equipment must be secured in the first window seat aft of a floor–to–ceiling bulkhead. Such seats are limited in availability.

Case 3:20-cv-10938-RHC-MJH   ECF No. 11-4, filed 04/15/20   PageID.21   Page 21 of 30

G. Carrier will refuse to transport items of carry–on baggage that may be harmful or dangerous to a passenger, the flight crew, or the aircraft.

# 47. Live Animals – Pets

*A. General Rules and Conditions*

The passenger assumes full responsibility for the conduct of his or her accompanying pet. In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, **the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant**.

Transportation of animals in the aircraft cabin must meet the following conditions:

- Allegiant will transport live animals only in the passenger cabin on flights within the contiguous 48 United States.
- All animals must be at least four (4) months of age.
- Allegiant will not transport animals as checked baggage. Pets that can be carried on board include domestic dogs and cats only, and the pet must be transported in a hard-sided or soft-sided, leak-proof carrier that can fit under a seat.
- Pets must remain in the carrier at all times in the airport gate area and while aboard the aircraft.
- All pet carriers may not exceed external dimensions of nine inches by sixteen inches by nineteen inches (9 in. X 16 in. x 19 in.).
- An Allegiant representative at the departure airport will determine if there is adequate room in the carrier for any pet. In the event of a disagreement, the Allegiant representative's decision will control.
- Animals cannot be ill or in distress.
- There is a one-hundred dollar ($100.00) fee for each one-way flight for a pet.
- Customers with animals in a carrier may not occupy a bulkhead row, an exit row, or the rows in front of or behind an exit row.
- Pet carriers may NOT be placed in or strapped into a passenger seat and must be placed under the seat directly in front of the passenger bringing the pet. All animals are required to be harmless, non-disruptive and odorless.
- Passengers with a pet carrier may bring one personal item, not to exceed exterior dimensions of 7 in. x 15 in. x 16 in. (17.8 cm x 38.1 cm x 40.6 cm), which may be stored in the overhead bin space free of charge.
- Passengers who choose to bring a carry-on bag along with a pet carrier, will be charged accordingly for the carry-on bag and must ensure that the carry-on bag does not exceed exterior dimensions of 9 in. x 14 in. x 22 in. (22.9 cm x 35.6 cm x 55.9 cm).
- Allegiant assumes no responsibility for the health or well-being of pets before, during or after a flight.

# 48. Service, Psychiatric Service and Emotional Support Animals

*48.1. General Rules and Conditions*

The passenger assumes full responsibility for the conduct of his or her accompanying service animal(s), emotional support animal and/or psychiatric service animal. In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with

the transport of such animal, *the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant*.

*48.2 Service Animals*

A service animal is an animal specifically trained to assist an individual in mitigating one or more disabilities by performing a specific task(s). Allegiant will accept as evidence that an animal is a service animal the presence of a harness on the animal and certain markings on harnesses, written documentation from a qualified source stating the individual's need for the animal, observation of the behavior of the animal, and the credible verbal assurances of the individual with a disability using the animal. To assist Allegiant in determining whether the service animal poses a direct threat to the health or safety of others, Allegiant requires the following form to be completed and presented to an Allegiant representative at check-in for each flight:

Veterinary Health Form (Allegiant Form 1) – a separate form is required for each service animal

*48.3 Psychiatric Service and Emotional Support Animals*

A psychiatric service animal (individually trained) or an emotional support animal (no training required) assists an individual in mitigating a mental or emotional disability. Documentation meeting the requirements below must be presented by the passenger prior to travel with a psychiatric service or emotional support animal. Allegiant requires that three (3) forms be presented to an Allegiant ticket counter representative at least one (1) hour prior to scheduled departure. The three (3) fully completed forms are as follows:

1. Veterinary Health Form (Allegiant Form 1)
2. Mental Health Professional Form (Allegiant Form 2)*
3. Animal Behavior & Responsibility Form (Allegiant Form 3)

*A fully compliant letter from a mental health professional or medical physician treating the passenger's emotional or mental disability will be accepted in lieu of the Allegiant Mental Health Professional Form. To be fully compliant the letter must identify the passenger by name and include the same or equivalent information from the mental health professional as required by the Allegiant Mental Health Professional Form.

*48.4 Animal Transport and Miscellaneous*

1. Allegiant only permits domestic dogs (except pit bull type breeds), cats and miniature horses that are being used as service animals by individuals with disabilities to accompany such individuals in the aircraft cabin at no charge. Allegiant prohibits the transport of pit bull type breeds. All other animals will be evaluated on a case-by-case basis.
2. Passengers accompanied by a psychiatric service animal or an emotional support animal are required to present the fully completed documentation specified above to an Allegiant ticket counter representative at least one (1) hour prior to scheduled departure.
3. Allegiant permits a service animal to accompany a qualified individual with a disability at either a bulkhead seat or a seat other than a bulkhead seat, as the individual prefers, unless the animal obstructs an aisle or other area that must remain unobstructed in order to

facilitate an emergency evacuation. Passengers with an animal transported in a carrier are prohibited from occupying a bulkhead seat. All seating accommodation requests must be made at least 24 hours prior to scheduled departure. If a seat request is made within 24 hours of scheduled departure, Allegiant will make a reasonable effort to accommodate the request without displacing another passenger.

4. Passengers are limited to one (1) emotional support/psychiatric service animal or up to three (3) trained service animals if required to perform work or tasks directly related to the passenger's disability. All such animal(s) must remain under the control of the passenger at all times and be leashed/harnessed to the passenger or be in a carrier at all times.

5. All animals are required to fit within the foot space of the disabled passenger and are prohibited from encroaching on the foot space of another passenger. If the animal encroaches on another passenger's foot space, the disabled passenger may be required to purchase a second seat to accommodate the animal. Animals are prohibited from occupying a seat and from sitting on or eating off of tray tables. Allegiant reserves the right to deny the transport of any animal that is improperly cleaned and/or has a foul odor, that appears to be ill or in physical distress, or that in the judgment of an Allegiant representative at the departure airport poses a direct threat to the health or safety of others.

6. Service animals in-training and Law Enforcement/Search and Rescue dogs may be accepted by Allegiant for transport with at least 72 hours prior notification and submission of any supporting documentation requested by Allegiant.

7. Allegiant strongly recommends using a soft-sided leak-proof carrier that fits under the seat whenever the size of the animal permits. Animal carriers may not exceed external dimensions of nine inches by sixteen inches by nineteen inches (9 in. X 16 in. x 19 in.).All animals are expected to be trained to behave in a public setting. Per the Code of Federal Regulations, Title 14, Part 382 (administered by the U.S. Department of Transportation), Allegiant reserves the right to deny transport to any animal displaying disruptive behavior, such as, but limited to:

   1. Growling, snarling, biting, attempting to bite or acting in an aggressive manner
   2. Running around or jumping on other passengers
   3. Relieving itself in the airport terminal or in the aircraft cabin
   4. Barking excessively (other than alerting passenger as trained)

If a passenger or a fully trained service, psychiatric service or emotional support animal does not meet the requirements of this Article 48, Allegiant reserves the right to deny boarding and/or transport of the animal.

## 49. – 54. Not Used

## 55. Checking of Baggage

A. Carrier will accept baggage for checking from a fare–paying passenger when tendered to Carrier no earlier than two (2) hours in advance of flight departure time at Carrier's airport ticket counter or curb–side check–in station, or at an earlier time on the day of commencement of travel as may be authorized by Carrier's Employees at the departure airport. Carrier will not check baggage tendered:

1. to a point beyond the destination indicated on the passenger's Ticketless Travel Confirmation;

2. to an intermediate stop or connection point;

3. for a flight to be operated on a later date.

## 56. – 59. Not Used

## 60. Checked Baggage Allowance

Upon presentation of a bag to be checked by a fare–paying passenger of a valid Ticketless Travel Confirmation, a checked baggage fee will apply.

Each piece of sporting equipment will be considered a checked bag with all applicable fees applied per person, per bag, per segment. All Baggage Fees are non-refundable except as provided in Article 65 below. Each bag must weigh 40 lbs or less and the outside measurements of each bag must not exceed eighty (80) inches. Applicable fees will be applied for those bags exceeding the weight and size limits. The total number of bags allowed may not exceed 5 per passenger.

- Firearms – Carrier will not accept assembled firearms and ammunition for transportation except as follows:
1. All passengers must declare their firearm at time of check-in.
2. Passengers must be 18 years of age to check a firearm.
3. Firearms and ammunition cannot be carried on board the aircraft but are accepted in checked baggage only.
4. Firearms must be unloaded and encased in a locked, hard-sided container acceptable to Allegiant for withstanding normal checked baggage handling without sustaining damage to the firearm. Only the individual checking the baggage should retain the key or combination.
a. Firearm parts, including magazines, clips, bolts and firing pins, are prohibited in carry-on baggage, but may be transported in checked baggage.
b. Replica firearms, including firearm replicas that are toys, may be transported in checked baggage only.
c. Rifle scopes are permitted in carry-on and checked baggage.

5. There is no limit to the number of firearms or corresponding accessories a passenger can carry in the locked hard-sided container.
a. Carrier will accept no more than a total gross weight of eleven (11) pounds of ammunition per passenger
b. Oversize / overweight restrictions still apply.

- If a mobility aid or assistive device, upon which a passenger who is a qualified individual with a disability is dependent, cannot be carried in the passenger cabin due to space limitations, such aid or device will be checked and carried in addition to the 2 piece maximum without charge.

## 61. – 64. Not Used

## 65. Excess Baggage Charges

A. Application – Excess baggage charges specified in this Article will be applicable from the point at which the baggage is accepted to the point to which the baggage is checked.
B. Charges:

Contract of Carriage / Allegiant Air

1. Baggage in excess of the five (5) bag maximum specified in Article 60 above will incur a charge of fifty dollars ($50.00) per piece per segment.

2. Baggage in excess of eighty (80) inches but not more than one hundred fifteen (115) inches (sum of outside length plus outside height plus outside width) will incur an oversize charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

3. Baggage weighing between forty–one (41) and seventy (70) pounds will be accepted as checked baggage for an excess weight charge of fifty dollars ($50.00) per item in addition to the assessed Baggage Fee. Baggage weighing between seventy–one (71) and ninety-nine (99) pounds will be accepted as checked baggage for an excess weight charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

C. No baggage more than 99 lbs. will be accepted.

## 66. – 74. Not Used

## 75. Baggage – Limitation of Liability

A. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery of checked or unchecked baggage and/or its contents, with the exception of wheelchairs, mobility aids, and assistive devices used by an individual with a disability, is limited to the proven amount of damage or loss, but in no event shall be greater than three-thousand, five-hundred dollars ($3,500) Domestic or 1,131 Special Drawing Rights International per fare-paying passenger. Carrier will compensate the passenger for reasonable, actual and documented damages incurred as a result of the loss of, damage to, or delayed delivery of such baggage up to the limit of liability or declared valuation, whichever is higher, provided the passenger has exercised reasonable effort to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

B. Carrier will be liable for such personal property only for the period in which it is in the custody of Carrier. While every reasonable effort will be made to return items inadvertently left behind by passengers onboard an aircraft, Carrier assumes no custody or responsibility for property carried onboard an aircraft by a passenger.

C. Carrier's liability with respect to damage to wheelchairs, other mobility aids, and assistive devices upon which an individual with a disability is dependent shall be the documented cost of repair. If a wheelchair, mobility aid, or assistive device is lost or irreparably damaged, the criteria for calculating the compensation for a lost, damaged, or destroyed wheelchair or other assistive device shall be the original purchase price of the device without depreciation. Carrier will also compensate the passenger for other reasonable expenses incurred as a result of the loss of, damage to, or delayed delivery of the wheelchair, mobility aid, or assistive device.

D. Carrier assumes no responsibility and will not be liable for money, jewelry, cameras, photographic, video and electronic equipment (including computers), silverware, natural fur products, precious gems and metals, medication, negotiable papers, securities, business documents, samples, items intended for sale, paintings and other works of art, antiques, collectors' items, photographs, artifacts, antiques, heirlooms, manuscripts, furs, keys, spirits, irreplaceable books or publications, and similar valuables, except for claims arising from international flights covered by the Montreal Convention. Carrier discourages the foregoing items being placed in checked baggage.

## 76. Fragile and Perishable Items as Baggage

Carrier may, but is not obligated to, conditionally accept previously damaged, improperly packed, fragile, or perishable items for carriage as checked baggage subject to the passenger's assumption of risk for damage to or destruction of such items. Fragile or perishable items will not be accepted as checked baggage unless they are properly packed in an original factory–sealed carton or case designed for shipping such items and if the item does not pose a risk of damage to other checked baggage.

## 77. – 79. Not Used

## 80. Claims

A. In the case of loss of, damage to, or delay in delivery of baggage, no claim will be entertained by Carrier unless preliminary written notice of such claim is presented to Carrier at the airport, within four (4) hours after arrival of the flight on which the loss, damage, or delay is alleged to have occurred or within twenty-four (24) hours for missing contents. The preliminary notice may thereafter be amended in writing; however, such amended claim must be presented to Carrier no later than twenty–one (21) days after the occurrence of the event giving rise to the claim.
B. Failure to provide notice within the foregoing time limits will not bar a claim if the claimant establishes to the satisfaction of Carrier that he or she was unable, through no fault or omission of the claimant, to provide notice within the specified time limits.
C. To the maximum extent permitted by law, no legal action on any claim described above may be maintained against Carrier unless commenced within one (1) year of Carrier's written denial of a claim, in whole or in part.

## 81. Smoking

Smoking aboard Carrier's aircraft is prohibited by federal law.

## 82. – 84. Not Used

## 85. Failure to Operate as Scheduled

A. This article covers:
1. Canceled Flights (both voluntarily changed by the carrier and for reasons beyond the carrier's control)
2. Late or Irregular Operations (both voluntarily changed by the carrier and for reasons beyond the carrier's control)
3. Schedule Changes

B. Cancel/Delay reasons beyond the carrier's control include, but are not limited to, acts of God, governmental actions, fire, weather, mechanical difficulties, Air Traffic Control, strikes or labor disputes, or inability to obtain fuel for the flight in question.
C. Carrier shall use its best efforts to notify all affected passengers promptly of planned schedule changes and service withdrawals.
D. If Carrier delays, cancels, or fails to operate any flight according to Carrier's published schedule, provided in the case of delay that the delay is significant, Carrier will, at the request of a passenger confirmed on an affected flight:
1. transport the passenger on another of Allegiant's flights on which space is available at no additional charge; or

2. refund the unused portion of the passenger's fare in accordance with Article 90 below; or

3. in the case of a schedule change made voluntarily by Carrier, and provided the schedule change is significant, refund the unused portion of the passenger's fare in accordance with Article 90 below.

E. Carrier shall not be liable for any consequential damages or incidental costs incurred by the passengers such as, but not limited to, loss of wages/income/salaries/emotional distress that arise from the failure or delay in operating any flight.

F. Carrier will attempt to transport passengers and their baggage promptly and as scheduled. Flight schedules, however, are subject to change without notice, and the times shown in or on Carrier's published schedules and advertising are not guaranteed. At times, without prior notice to passengers, Carrier may need to substitute other aircraft, airlines or means of transportation and may change, add, or omit intermediate or connecting stops. Carrier cannot guarantee that passengers will make connections to other flights of its own or those of other airlines. In the event of flight schedule changes, Carrier will attempt to notify affected passengers as soon as possible at the airport or en route.

G. If a flight is unable to land at the destination airport and is diverted to another airport, the carriage by air shall, unless the aircraft continues to the original destination, be deemed to be completed when the aircraft arrives at the diversion airport. Carrier may, however, arrange or designate alternative transportation, whether by Carrier's own service or by other means of transportation specified by Carrier (which may include ground transportation) to transport passengers to the original destination without additional cost.  Exceptions may include situations where alternative transportation is prevented by safety concerns. When alternative transportation to the original destination is provided by or at the direction of Carrier, any arrangements made by one or more passengers on their own will not be paid for or reimbursed by Carrier and are at the passengers' own risk.

## 86. – 89. Not Used

## 90. Refunds

A. Nonrefundable fares – Nonrefundable fares are not eligible for refunds, except as provided in Articles 85.A above and 90.B.through 90.D. below.

B. Flight terminations or involuntary cancellations – If a passenger's scheduled transportation is canceled, or terminated before the passenger has reached his or her final destination as a result of a flight cancellation or omission of a scheduled stop, Carrier will, at the passenger's option, transport the passenger on another of Carrier's flights on which space is available at no additional charge, or refund the fare for the unused transportation, or provide a credit voucher for such amount toward the purchase of future travel.

C. Denied boarding – If Carrier denies boarding or removes a passenger from an aircraft under conditions described in Article 10 (except Articles 10.B, 10.C, and 10.F) or Article 35.F above, Carrier will refund the fare paid for the unused portion thereof. If Carrier denies boarding or removes a passenger under any of the circumstances enumerated in Article 10.B, 10.C or 10.F, fares paid for any unused travel segment shall be forfeited and non-refundable.

D. Eligible fare refunds and credits will be made by Carrier as follows:

1. when no portion of the transportation has been provided, the refund or credit will be issued in an amount equal to the fare paid (subject to Article 90.C above) less applicable change fees;

2. when a portion of the transportation has been provided, the refund or credit will be made in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided, (subject to Article 90.C above) less applicable change fees; or

3. if a customer cancels an entire air transportation itinerary within 24 hours after booking the itinerary and the scheduled time of departure of the initial flight in the itinerary was at least one week (168 hours) away at the time of booking, a full refund will be issued; provided, this does not apply when the air transportation was purchased as part of a package consisting of air and ground elements. Such cancellation may be accomplished online via the customer's "My Allegiant" account or by contacting the Allegiant Reservation Center by telephone.

E. Carrier shall make eligible refunds according to the original form of payment. Refunds for fares purchased with a debit or credit card shall be processed for crediting back to the same card account no later than seven (7) days from the date the refund request is received by Carrier. All credit refunds will be issued in the currency used at purchase (USD). Refunds for fares purchased with cash or by check will be issued by check no later than twenty (20) days after the refund request is received by Carrier; provided that, with regard to fares purchased by check, in cases where Carrier has reasonable cause to suspect fraud, Carrier may delay making an otherwise eligible refund until such time as the check by which the fare was purchased has cleared the financial institution on which it was drawn and Carrier has received payment from such institution. Refunds for fares purchased with instalment payments offered through a third party company, must be requested to Allegiant for the cancelation of the itinerary but the third party company will manage the settlement of the credit line and the final refund to the Customer.

## 91. – 104. Not Used

## 105. Denied Boarding Compensation

A. The following definitions, as prescribed in 14 C.F.R. § 250.1, pertain solely to the denied boarding compensation provisions of this Article:

**Airport** means the airport at which the direct or connecting flight, on which the passenger holds confirmed reserved space, is planned to arrive or some other airport serving the same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the passenger.

**Comparable air transportation** means transportation provided to passengers at no extra cost by a direct air carrier holding a certificate of public convenience and necessity or commuter authority issued by the U.S. Department of Transportation, or by a foreign air carrier holding a foreign air carrier permit issued by the U.S. Department of Transportation authorizing the scheduled air transportation of persons.

**Confirmed reserved space** means space on a specific date and on a specific flight of Carrier which has been requested by a passenger and which Carrier or its authorized agent has verified, by appropriate notation on the ticket or Ticketless Travel Confirmation, or in any other manner provided by this Contract of Carriage, as being reserved for the accommodation of the passenger.

**Stopover** means a deliberate interruption of a journey by the passenger, scheduled to exceed four (4) hours, at a point between the place of departure and the place of final destination.

**The sum of the values of the passenger's remaining flight coupons** means the sum of the applicable one–way fares, including any surcharges, airport or passenger facility charges, and air transportation taxes, less any applicable discounts.

B. Request for Volunteers – In the event of an unintentional overbooked flight, Carrier shall request volunteers for denied boarding. A volunteer is a person who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his or her confirmed reserved space. Any other passenger denied boarding is considered to have been denied boarding involuntarily, even if that passenger accepts denied boarding compensation. If an insufficient number of volunteers come forward, Carrier may deny boarding to other passengers. However, Carrier will not deny boarding to any passenger involuntarily who was earlier asked to volunteer without having been informed about the possibility of being denied boarding involuntarily and the amount of compensation specified in Article 105.E. below.

C. Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversell – Subject to the exception in Article 105.D. below, Carrier will tender to a passenger the amount of compensation specified in Article 105.E. below, when:

1. the passenger holds a ticket for confirmed reserved space and presents himself or herself for carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, reconfirmation, check-in, and acceptability for transportation in accordance with this Contract of Carriage; and

2. other than for reasons set forth in Article 10 above, or when resulting from substitution for operational or safety reasons of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the passenger on the flight for which the passenger holds confirmed reserved space, and such flight departs without the passenger.

D. Exception – The passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the passenger's next stopover or, if none, at the airport of the passenger's final destination not later than one (1) hour after the planned arrival time of the passenger's original flight or flights.

E. Amount of Compensation Payable to Passengers Involuntarily Denied Boarding Due to an Oversell:

1. Domestic Transportation Passengers traveling between points within the United States (including the territories and possessions) who are denied boarding involuntarily from an oversold flight are entitled to: (1) No compensation if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover not later than one hour after the planned arrival time of the passenger's original flight; (2) 200% of the fare to the passenger's destination or first stopover, with a maximum of $675, if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover more than one hour but less than two hours after the planned arrival time of the passenger's original flight; and (3) 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,350, if the carrier does not offer alternate transportation that is planned to arrive at the airport of the passenger's destination or first stopover less than two hours after the planned arrival time of the passenger's original flight.

| 0 to 1 hour arrival delay. | No compensation. |
| --- | --- |

| 1 to 2 hour arrival delay. | 200% of one-way fare (but no more than $675). |
| Over 2 hours arrival delay. | 400% of one-way fare (but no more than $1,350). |

2. Except as provided below, the airline must give each passenger who qualifies for involuntary denied boarding compensation a payment by cash or check for the amount specified above, on the day and at the place the involuntary denied boarding occurs. If the airline arranges alternate transportation for the passenger's convenience that departs before the payment can be made, the payment shall be sent to the passenger within 24 hours. The air carrier may offer free or discounted transportation in place of the cash payment. In that event, the carrier must disclose all material restrictions on the use of the free or discounted transportation before the passenger decides whether to accept the transportation in lieu of a cash or check payment. The passenger may insist on the cash/check payment or refuse all compensation and bring private legal action.

3. Acceptance of the compensation may relieve Allegiant Air from any further liability to the passenger caused by its failure to honor the confirmed reservation. However, the passenger may decline the payment and seek to recover damages in a court of law or in some other manner.

## 106. – 115. Not Used

## 116. Ticketless Travel Acceptability

Carrier will accept only its own electronic Ticketless Travel Confirmation, and then only if all transportation written thereon uses the services of Carrier. Any tickets issued in conjunction with travel on another carrier will not be accepted.

## 117. – 123. Not Used

## 124. Check Acceptance

Allegiant accepts most major credit and debit cards. Allegiant does not accept cash, check, or money orders in-flight or at any airport location.

## 125. - 126. Not Used

## 127. Right to Change Contract

Carrier reserves the right, to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this Contract of Carriage without prior notice. All changes must be in writing and approved by a corporate officer of Carrier.